UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ZACHARY LOCKHART,

Plaintiff,

v.

PATRICK DANIEL ARANAS DACQUEL and JAMIE ELIZABETH MALLOY DACQUEL, *also known as James Elizabeth Dacquel also known as Jamie Malloy*,

Defendants.

**DECISION AND ORDER**

6:23-CV-06438 EAW

## INTRODUCTION

Plaintiff Zachary Lockhart ("Plaintiff" or "Lockhart") brings this action against defendants Patrick Daniel Aranas Dacquel ("Dacquel") and Jamie Elizabeth Malloy Dacquel ("Malloy") (collectively, "Defendants"), alleging a violation of the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4851 *et seq*., as well as state-law claims for fraud and unjust enrichment, related to the sale of real property. (Dkt. 1). Pending before the Court is Defendants' motion for summary judgment. (Dkt. 50). For the following reasons, Defendants' motion is granted and the Clerk of Court is directed to enter judgment in favor of Defendants on all of Lockhart's claims.

## BACKGROUND

### I. Factual Background

The following facts are taken from Defendants' statement of undisputed facts (Dkt. 51), Plaintiff's response thereto (Dkt. 59-26),[1] and the exhibits submitted by the parties. Unless otherwise noted, the following facts are undisputed.

Defendants purchased property located at 73 Taylor Road in the Town of Mendon, New York (the "Property") from an architect named Blake Held ("Held") in 2020. (Dkt. 51 at ¶¶ 1-2, 28; Dkt. 59-26 at ¶¶ 1-2, 28). The Property includes a house that was originally built in 1827 in Henrietta, New York, but when Held purchased the house in 2001, he spent years restoring it and transported it to its current location in Mendon. (Dkt. 51 at ¶¶ 3-12, 15-23; Dkt. 59-26 at ¶¶ 3-12, 15-23). The Town of Mendon issued a certificate of occupancy for the Property in 2004. (Dkt. 51 at ¶ 27; Dkt. 59-26 at ¶ 27; Dkt. 51-1).

At the time of the sale, Defendants received a lead paint disclosure form from Held, indicating that he was unaware of any lead-based paint in the house. (Dkt. 51 at ¶ 32; Dkt. 59-26 at ¶ 32; Dkt. 52-3; Dkt. 55 at ¶ 14).[2] Defendants had an inspection conducted shortly

---

[1] Lockhart's opposing statement of undisputed material facts does not comply with the District's Local Rules because the responding paragraphs do not contain any record citations. Instead, he repeatedly responds based on personal knowledge and belief with no record citations—much like a pre-discovery pleading rather than a post-discovery summary judgment statement of facts. *See* Loc. R. Civ. P. 56(a)(2) (requiring opposing statement of facts to cite to admissible evidence); *see also* Fed. R. Civ. P. 56(c)(1). Lockhart's subjective beliefs are insufficient to raise an issue of material fact. But despite his non-compliance, the Court has noted where Lockhart disputes Defendants' statement of facts.

[2] The lead paint disclosure form provided by Held, submitted by Defendants, is illegible in certain parts. (*See* Dkt. 52-3). But Held's affidavit states that the lead

after they bought the Property, which did not identify the presence of lead paint in the house. (Dkt. 51 at ¶¶ 34-35; Dkt. 59-26 at ¶¶ 34-35; Dkt. 51-4).

Two years later, Defendants decided to sell the Property and hired a real estate agency, Howard Hanna, to market and sell the Property. (Dkt. 51 at ¶¶ 38-40; Dkt. 59-26 at ¶¶ 38-40; Dkt. 51-5). Howard Hanna assigned Irene Bennett ("Bennett") to serve as Defendants' agent, and she generated an online listing for the Property. (Dkt. 51 at ¶¶ 41-42; Dkt. 59-26 at ¶¶ 41-42; Dkt. 51-6; Dkt. 52-24 at 13-14). The listing indicated that the house was built in 2004 with the notation "Year Built: 2004." (Dkt. 51 at ¶ 44; Dkt. 59-26 at ¶ 44; Dkt. 51-6 at 2). But in the "public remarks" section, the listing stated: "THE ORIGINAL HOUSE WAS BUILT IN 1827, MOVED TO ITS CURRENT LOCATION IN 2004." (Dkt. 51 at ¶ 45; Dkt. 59-26 at ¶ 45; Dkt. 51-6 at 2). To create the listing, Bennett used a Multiple Listing Service tool that automatically populated information from municipal records, including the "year-built" data, into the listing. (Dkt. 51 at ¶¶ 42-44; Dkt. 59-26 at ¶¶ 42-44; Dkt. 52-24 at 20-21). The information in the "public remarks" section was manually entered by Bennett. (Dkt. 51 at ¶ 45; Dkt. 59-26 at ¶ 45; Dkt. 52-24 at 22-23; Dkt. 52-6 at 2). Defendants also completed a Property Condition Disclosure Statement ("PCD Statement") at Bennett's request before selling the Property, which stated that the age of the house was "193 years, renovated 2004." (Dkt. 51 at ¶¶ 48-50; Dkt. 59-26 at ¶¶ 48-50; Dkt. 51-7 at 2; Dkt. 52-24 at 30-31).

---

disclosure form denied any knowledge of lead paint in the house (Dkt. 55 at ¶ 14), and Lockhart does not dispute this (Dkt. 59-26 at ¶ 32).

Lockhart contracted to purchase the Property on August 8, 2022. (Dkt. 51 at ¶ 64; Dkt. 59-26 at ¶ 64; Dkt. 51-10). On September 14, 2022, Lockhart performed a final walkthrough of the Property, at which point he thought there was a possibility of lead paint on the Property because he saw "alligatoring" paint on a detached shed which he considered to be a "red flag" for lead. (Dkt. 51 at ¶¶ 72-73; Dkt. 59-26 at ¶¶ 72-73; Dkt. 52-23 at 152; Dkt. 59 at ¶ 10). Lockhart and his wife sent a list of questions and concerns about the Property to their real estate attorney, Chip Presutti ("Presutti"), after the walkthrough, which he forwarded to Bennett. (Dkt. 51 at ¶¶ 76-77; Dkt. 59-26 at ¶¶ 76-77; Dkt. 51-11). The list did not include any questions or concerns about the age of the house or the presence of lead-based paint. (Dkt. 51 at ¶¶ 76-77; Dkt. 59-26 at ¶¶ 76-77; Dkt. 51-11). The parties closed on the Property two days after the final walkthrough. (Dkt. 51 at ¶ 83; Dkt. 59-26 at ¶ 83).

After closing, Lockhart tested parts of the house for the presence of lead and the results indicated that the house contained lead-based paint. (Dkt. 51 at ¶¶ 84-85; Dkt. 59-26 at ¶¶ 84-85; Dkt. 52-23 at 183-87). Presutti relayed this information to Bennett and requested a lead paint disclosure form. (Dkt. 51 at ¶¶ 85-86; Dkt. 59-26 at ¶¶ 85-86; Dkt. 52-23 at 187-88; Dkt. 52-24 at 45). Bennett asked Defendants to complete the lead paint disclosure form, which was completed and provided to Presutti the next day. (Dkt. 51 at ¶¶ 87-89; Dkt. 59-26 at ¶¶ 87-89; Dkt. 52-24 at 45-46; Dkt. 51-12). The disclosure form indicates that Defendants had no knowledge of "lead-based paint and/or lead-based paint hazards in the housing" and that Defendants had "no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing." (Dkt. 51-12).

On September 19, 2026, Presutti contacted Bennett to discuss rescinding the contract based on Plaintiff's discovery of lead-based paint. (Dkt. 51 at ¶ 96; Dkt. 59-26 at ¶ 96; Dkt. 51-14; Dkt. 51-15). But Presutti emailed Bennett the next day to inform her that "the closing has been recorded and Mr. Lockhart is now the owner of the property." (Dkt. 51 at ¶ 100; Dkt. 59-26 at ¶ 100; Dkt. 51-16). On September 21, 2022, Lockhart acknowledged receipt of Defendants' lead disclosure form and indicated he wanted a 10-day opportunity to conduct a risk assessment or inspection for the presence of lead-based paint. (Dkt. 51 at ¶ 101; Dkt. 59-26 at ¶ 101; Dkt. 51-17). Three days later, Presutti forwarded an email from Lockhart to Bennett stating that a professional lead inspection showed there was lead in the house and that these test results were "unsatisfactory." (Dkt. 51 at ¶¶ 105-06; Dkt. 59-26 at ¶¶ 105-06; Dkt. 51-19; Dkt. 59-9). Lockhart maintains that he never accepted the Property (Dkt. 52-23 at 202) but acknowledges that he is the legal owner (Dkt. 59 at ¶ 25; Dkt. 52-23 at 204) and moved into the Property in November 2023 (Dkt. 52-23 at 202).

## II. <u>Procedural Background</u>

Lockhart commenced this action on August 4, 2023 (Dkt. 1), and Defendants timely answered (Dkt. 4). Defendants filed a motion for summary judgment on February 21, 2025. (Dkt. 32). After fact discovery closed, but before the close of expert discovery, the parties submitted a joint letter requesting a stay of the remaining discovery deadlines until the summary judgment motion was resolved (Dkt. 47), which the Court granted (Dkt. 48). The Court then denied Defendants' summary judgment motion without prejudice for failure to follow this District's Local Rules. (Dkt. 49). Defendants filed a renewed motion

for summary judgment on August 11, 2025, that complied with the Local Rules. (Dkt. 50). Plaintiff responded to the motion (Dkt. 59) and Defendants filed a reply (Dkt. 60).

## **DISCUSSION**

### **I. Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, it finds that no rational jury could find for that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec*., 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

## II. Analysis

### A. Residential Lead-Based Paint Hazard Reduction Act

Congress enacted the Residential Lead-Based Paint Hazard Reduction Act of 1992 ("RLPHRA"), 42 U.S.C. § 4851 *et seq.*, as part of the Housing and Community Development Act of 1992. *Sweet v. Sheahan*, 235 F.3d 80, 83-84 (2d Cir. 2000). RLPHRA "directs the Secretary of the Department of Housing and Urban Development ('HUD') and the Administrator of the Environmental Protection Agency ('EPA') to promulgate regulations mandating the disclosure of lead-based paint hazards in privately owned housing that is sold or leased." *Id.* at 84; *see* 42 U.S.C. § 4852d. The regulations promulgated under this section provide:

> [B]efore the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall--
>
> > (A) provide the purchaser or lessee with a lead hazard information pamphlet, as prescribed by the Administrator of the Environmental Protection Agency under section 406 of the Toxic Substances Control Act;
> >
> > (B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor; and
> >
> > (C) permit the purchaser a 10-day period (unless the parties mutually agree upon a different period of time) to conduct a risk assessment or inspection for the presence of lead-based paint hazards.

42 U.S.C. § 4852d(a)(1). These requirements only apply to "target housing," *id.*, which is defined in the regulations as "any housing constructed prior to 1978," 24 C.F.R. § 35.86; 40 C.F.R. § 745.103. When a seller hires a real estate agent, it is the agent's responsibility to "ensure compliance" with the lead disclosure requirements. 42 U.S.C. § 4852d(a)(4);

*see also* 24 C.F.R. § 35.94; 40 C.F.R. § 745.115. But the statute ultimately provides that "[a]ny person who *knowingly violates* the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4852d(b)(3) (emphasis added).[3]

There is no dispute that the house was originally built in 1827[4] and that Defendants did not provide (a) the lead hazard information pamphlet, (b) any disclosure about the presence of lead-based paint in the home, or (c) a 10-day opportunity to conduct a lead paint risk assessment until after the parties closed on the sale. (Dkt. 51 at ¶¶ 4, 83, 88-92; Dkt. 59-26 at ¶¶ 4, 83, 88-92). Thus, the issue is whether Defendants "knowingly violated" the lead disclosure requirements. The undisputed material facts establish that Defendants did not.

In the RLPHRA context, courts construe "knowingly" to mean that the defendant "was aware of his or her conduct and that defendant did not perform it merely through ignorance, mistake or accident." *G.M.M. v. Kimpson*, 92 F. Supp. 3d 53, 71 (E.D.N.Y.

---

[3] The liability provisions are promulgated in the regulations at 40 C.F.R. § 745.118(c) and 24 C.F.R. § 35.96(c). Although the parties cite to the statute, it is the regulations that provide the enforcement mechanism. *See Sweet v. Sheahan*, 235 F.3d 80, 88 (2d Cir. 2000) ("Although the statute itself did not impose enforceable obligations on private parties, the agencies, in an effort to fashion a workable scheme, did so through the regulations.").

[4] The parties have not cited, nor has the Court's own research discovered, any legal authority addressing the applicability of these disclosure requirements to the situation here—in other words, where a house is originally built before 1978, but then substantially renovated and relocated to another location. But Defendants have not disputed RLPHRA's applicability, and thus the Court assumes that the disclosure requirements apply in this context.

2015) (quoting *Smith v. Coldwell Banker Real Est. Servs.*, 122 F. Supp. 2d 267, 273 (D. Conn. 2000)). Defendants rely on their own affidavits and Bennett's deposition testimony to support the conclusion that they were never aware of the lead paint disclosure requirements. (Dkt. 57 at 14). Both Dacquel and Malloy state that Bennett never advised them that a lead paint disclosure was required and that neither of them was ever independently aware of their obligation to provide the disclosure. (Dkt. 53 at ¶¶ 12, 19; Dkt. 54 at ¶¶ 12, 17, 23).

Bennett testified at her deposition that although she was aware of the lead paint disclosure requirements for houses built before 1978, she did not ask Defendants to complete a lead paint disclosure form because she did not believe it was required after the house was remodeled and relocated. (Dkt. 52-24 at 17-19, 32-33, 49). To explain this confusion, Bennett testified that she used a tool called a Multiple Listing Service to create the listing to sell the Property. (*Id.* at 20). The tool automatically populates certain information about a property including the build year, square footage, and acreage, pulled from municipal records into the listing. (*Id.* at 20-21). When Bennett entered the Property's address into the Multiple Listing Service tool, it automatically generated the build-year as 2004 in the listing. (*Id.* at 21-22; *see* Dkt. 51-6). Bennett also testified that she was aware that the certificate of occupancy for the Property was issued by the Town of Mendon in 2004, which she understood to mean that 2004 was "the age of the house." (Dkt. 52-24 at 25; *see also* Dkt. 51-1). These factors led Bennett to conclude that a lead

paint disclosure was not required. (Dkt. 52-24 at 49).[5] Indeed, she testified that as of the date of her deposition she was still unsure whether a lead paint disclosure was required. (*Id.*).

Defendants also demonstrated that they did not know there was lead-based paint in the house. When Defendants purchased the Property from Held in 2020, they received a lead paint disclosure form that indicated Held had no knowledge of lead-based paint in the house nor any reports or records pertaining to the presence of lead-based paints. (Dkt. 51-3; Dkt. 53 at ¶ 4; Dkt. 54 at ¶ 4; Dkt. 55 at ¶ 14). Although Defendants had the house inspected shortly after purchasing the Property, the inspection report expressly disclaimed any requirement "to determine . . . the presence of . . . hazardous materials including, but not limited to, the presence of lead in paint[.]" (Dkt. 51-4 at 7). Furthermore, both Dacquel and Malloy state in their affidavits that the inspection did not reveal the presence of lead-based paint in the house and neither had knowledge of lead-based paint before closing. (Dkt. 52 at ¶¶ 5, 14; Dkt. 54 at ¶¶ 5, 12).

Defendants have therefore met their burden to show that neither they nor their real estate agent knowingly violated the lead paint disclosure requirements. While Bennett's failure to inform Defendants of the lead paint disclosure requirements may have been

---

[5] Lockhart does not provide facts to dispute in his opposition to Defendants' statement of material facts that "Ms. Bennett did not ask Dacquel and Malloy to complete a lead paint disclosure because she believed that the house had been re-designated as a 2004 build." (Dkt. 51 at ¶ 54; Dkt. 59-26 at ¶ 54). Instead, Lockhart only denies that he has "knowledge or information sufficient to form a belief" about the accuracy of Defendants' factual assertion. (Dkt. 59-26 at ¶ 54). As noted previously, Lockhart's subjective belief is insufficient to raise a genuine dispute of fact.

negligent due to her belief that the disclosure was unnecessary, negligence is insufficient to establish RLPHRA liability. *See Kimpson*, 92 F. Supp. 3d at 71 (noting that the knowledge standard is higher than "mere negligence").

In response, Lockhart fails to raise a triable issue of fact. He argues that Defendants knew about their obligation to provide a lead-paint disclosure form based on information they received from Held. Lockhart points to the property listing from when Defendants bought the house from Held that states the year-built date as 1827 (Dkt. 51-2 at 2) and that Defendants received a lead paint disclosure from Held (Dkt. 51-3). (Dkt. 59-27 at 12). Lockhart also highlights an email sent by Held to Defendants on September 20, 2022, in which he stated that "[t]he sale of any older home comes with the knowledge that lead is a possible contaminant" and asked "isn't a lead disclosure required?" (Dkt. 59-27 at 12; Dkt. 59-13). Plaintiff argues that taken together, these facts show that Defendants knew "of the risk of lead-based paint in the home" and that they needed to provide the lead-paint disclosures. (Dkt. 59-27 at 12). The Court disagrees.

While there is no dispute that Defendants knew that the house was originally built in 1827 (Dkt. 52-22 at 15; Dkt. 52-21 at 12) and that they received a lead paint disclosure form from Held when they purchased the Property (Dkt. 51 at ¶ 32; Dkt. 59-26 at ¶ 32), those facts do not address whether Defendants knew they had to provide Lockhart with the lead paint disclosure material. *See Smith*, 122 F. Supp. 2d at 273 ("[Defendants] cannot be liable for their inadvertence or inattentiveness[.]"). Lockhart argues that the lead paint disclosure received from Held "should have signaled to the Defendants" that they needed to provide that disclosure to Lockhart. (Dkt. 59-27 at 12). But Defendants may only face

liability under RLPHRA based on "knowing" violations, not based on what they "should have" known. Moreover, RLPHRA and the promulgated regulations expressly put the burden on the sellers' agent to ensure compliance with the lead paint disclosure requirements. 42 U.S.C. § 4825d(a)(4); 24 C.F.R. § 35.94; 40 C.F.R. § 745.115. The regulations provide that the agent shall inform the sellers of their disclosure obligations and "[e]nsure that the seller . . . has performed all" disclosure activities. 40 C.F.R. § 745.11(a); 24 C.F.R. § 25.94(a). And it is undisputed that Bennett never informed Defendants of any obligation to provide a lead paint disclosure before closing—indeed she testified that she did not give Defendants a lead paint disclosure form to complete because she did not believe it was required. (Dkt. 52-24 at 32-33).[6] The email from Held also does not raise a triable issue of fact regarding Defendants' pre-closing knowledge because that email was sent on September 20, 2022, four days after the parties closed on the Property. (*See* Dkt. 59-13).

Under the circumstances, no reasonable jury could conclude that Defendants knowingly violated RLPHRA's lead paint disclosure requirements. Lockhart has failed to raise a triable issue of fact on this point and therefore Defendants' summary judgment motion as to Lockhart's RLPHRA claim is granted.

---

[6] Bennett is not a party to this lawsuit. *See G.M.M. v. Kimpson*, 92 F. Supp. 3d 53, 75 (E.D.N.Y. 2015) (noting that RLPHRA liability "does not fall" on lessor-defendant where the lessor-defendant's agent was not sued). Lockhart cites *Vidiksis v. E.P.A.*, 612 F.3d 1150 (11th Cir. 2010) to argue that hiring an agent does not absolve Defendants of RLPHRA liability. (Dkt. 59-27 at 11). But the issue here is not whether hiring an agent insulates a seller from liability; rather, it is the lack of proof that Defendants knowingly violated RLPHRA's disclosure requirements.

### B. State-Law Claims

With Plaintiff's federal cause of action dismissed, the Court must determine whether it should continue to exercise supplemental jurisdiction over the remaining state-law claims. *See Chenensky v. N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388, 391 (S.D.N.Y. 2013) ("Courts must determine whether to continue to exercise supplemental jurisdiction 'at every stage of the litigation.'" (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 445 (2d Cir. 1998))). "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). "District courts weigh several factors in determining whether to exercise supplemental jurisdiction, including 'the values of judicial economy, convenience, fairness and comity.'" *Chenensky*, 942 F. Supp. 2d at 391 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "Courts consider their familiarity with the facts, the timing of the case, the number of parties and claims, the amount of discovery, and whether there is ongoing parallel litigation when evaluating judicial economy." *Id.* at 392.

This case was commenced three years ago, and the parties have proceeded through discovery into the summary judgment stage. By resolving the federal claim, the Court is familiar with the facts of the case, and it may be many months or years before the parties reach the summary judgment stage if the case were litigated in state court, which would incur further costs for both parties. Therefore, in the interest of the parties and judicial economy, the Court exercises its discretion and retains jurisdiction to resolve the supplemental state-law claims.

### 1. Fraud

"Under New York law, the five elements of fraud are '(1) a material misrepresentation or omission of fact (2) made by [a] defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)). "Each element 'must be shown by clear and convincing evidence.'" *Id.* (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)). Lockhart contends that Defendants made two materially false statements in the property listing that underlie his fraud claim: (1) that the house was "completely renovated to today's standards"; and (2) that the house was built in 2004. (Dkt. 59-27 at 15). For the reasons explained below, the Court disagrees and grants summary judgment in favor of Defendants on the fraud claim.

#### a. Renovation to Today's Standards

Lockhart alleges that Defendants misrepresented that the "Property was renovated to 2004 construction standards" when it was marketed as "completely renovated to today's standards." (Dkt. 1 at ¶ 29). Based on this representation, Lockhart "expect[ed] [the Property] to be a lead-free home" when he purchased it. (*Id.* at ¶ 30). The parties disagree whether "2004 construction standards" includes the abatement of lead-based paint and whether that statement was an opinion or a statement of fact. (*See* Dkt. 57 at 17-20; Dkt. 59-27 at 16-19). Defendants argue that "'2004 standards,' . . . permitted the encapsulation or containment of lead-based paints" and insist that any lead-based paint was properly

treated in that manner. (Dkt. 57 at 19). Lockhart, by contrast, argues that "after lead-based paint was banned in 1978, there is an expectation that homes built after 1978 should be free of lead-based paint and would not need encapsulation or containment." (Dkt. 59-27 at 16). The Court need not resolve that issue because, even assuming renovation to "today's standards," meant the Property was free of lead paint, there is no evidence that Defendants knew the alleged misrepresentation was false and intended to defraud Lockhart.

To be liable on a fraud claim, Defendants "must have had knowledge of the representation's falsity and intent to defraud." *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 702 (S.D.N.Y. 2012). Accepting Lockhart's position that the statement in the property listing that the house was "completely renovated to today's standards" meant that it was a "lead-free home," for the same reasons discussed above for the RLPHRA claim, there is no evidence that Defendants knew the Property contained lead-based paint or other lead hazards in the home.

As discussed above, the lead-paint disclosure Defendants received from Held indicated that he had no knowledge or records of lead-based paint hazards in the house. (Dkt. 51-3 at 2; Dkt. 53 at ¶ 4; Dkt. 54 at ¶ 4). Held confirms the same in his affidavit. (Dkt. 55 at ¶ 14). Defendants had an inspection performed after they purchased the Property, but the inspection report expressly stated it was not intended to discover the presence of lead-based paints used in the house. (Dkt. 51-4 at 7). And both Defendants deny ever knowing if there was lead-based paint in the home. (Dkt. 53 at ¶ 7; Dkt. 54 at ¶ 7).

In response, Lockhart argues that the alleged misrepresentation was that the house was renovated to "today's standards" and not that "Defendants fraudulently claimed the Property was free of lead-based paint." (Dkt. 59-27 at 19-20). But this is a distinction without a difference as Lockhart makes *repeatedly* clear that the representation that the house was renovated to "today's standards" meant to him that "lead-based paint would not be a risk." (*Id.* at 20); (*see also* Dkt. 1 at ¶ 30 ("Plaintiff reasonably relied on the misrepresentations . . . expecting it to be a lead-free home. . . ."); Dkt. 59-27 at 15 ("Lockhart relied on the misrepresentation that the Property was a 2004 buil[d] and completely renovated to today's standards . . . because it led him to believe that there was no risk of lead in the home[.]"); *id.* at 16 ("[H]ad [Lockhart] known the house was built before 1987, he would not have purchased it due to the risk of lead."); *id.* at 20 ("[W]hen the house was marketed as built in 2004 and 'completely renovated to today's standards' [Lockhart] did not believe he needed to worry about lead paint."); Dkt. 59 at ¶ 4 ("[Lockhart] was under the impression that the Property was built in 2004 to today's standards and free of lead[.]")). Lockhart does not identify any other modern standard that he interpreted that representation to convey.

Even accepting that the misrepresentation was the amorphous statement that the house was built to "today's standards," Lockhart cannot point to any evidence suggesting that Defendants knew that the house was not built to 2004 standards and intended to deceive him. Indeed, the evidence points to the contrary. The property listing created by Bennett mirrors the language used by Held when he sold the Property to Defendants. Held's listing states that the house had been "lovingly restored and

renovated. . . . thoughtfully adding the modern conveniences appreciated by today's standards." (Dkt. 51-2 at 2). Malloy's affidavit states that she was aware of the listing before Defendants purchased the Property. (Dkt. 54 at ¶ 2). That language is not meaningfully different from the listing created by Bennett, which contains the allegedly false statement that the house was "COMPLETELY RENOVATED TO TODAY'S STANDARDS & AMENITIES WHILE STILL PRESERVING THE CHARACTER AND CHARM." (Dkt. 51-6). Lockhart presents no evidence that Defendants knew that representation was false and intended to defraud potential buyers.

Lockhart tries to get around this lack of evidence by arguing that Bennett and Defendants had a "responsibility to correct. . . inaccuracies" in the property listing. (Dkt. 59-27 at 17). This argument misses the point that there is no evidence that either Bennett or Defendants knew that the listing contained a misrepresentation. To the extent Lockhart relies on the affidavits of Mark Siwiec (Dkt. 59-22) and Andrew McLellan (Dkt. 59-24) to argue what Bennett or Defendants "should have known" or "should have done," the Court agrees with Defendants that these opinions include inadmissible legal conclusions. *See GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 343 (N.D.N.Y. 2013) ("Expert witness statements embodying legal conclusions exceed the permissible scope of opinion testimony under the Federal Rules of Evidence." (citation modified) (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005))). For example, Mr. McLellan opines that Defendants "should have presumed that lead-based paint was present in their home and made proper disclosures to alert Mr. Lockhart and other possible buyers of the presence of lead-based paint[.]" (Dkt. 59-24 at ¶ 17). Similarly, Mr. Siwiec

concludes that "it was reasonable for Mr. Lockhart to rely on [Defendants'] actions and inactions to conclude that the property was free of lead." (Dkt. 59-22 at ¶ 18). These assertions are not proper expert opinion. "[A]lthough an expert may give his [or her] opinion on an issue of fact that the jury will eventually decide, 'he [or she] may not give testimony stating ultimate legal conclusions based on those facts.'" *GlobalRock Networks, Inc.*, 943 F. Supp. 2d at 343 (quoting *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 181 (N.D.N.Y. 2002)). Stripped of legal conclusions, the affidavits are insufficient to raise an issue of material fact. In other words, nothing in either the affidavit of Mr. Siwiec or Mr. McLennan establishes that Defendants knew the Property contained lead paint and intended to deceive Lockhart about this.

Lockhart's reliance on *Dimatos v. Michel*, 160 A.D.2d 1083 (3d Dep't 1990) is also misplaced. In that case, the plaintiff alleged that the defendant fraudulently misrepresented the quality of well water on the property purchased by the plaintiff. *Dimatos*, 160 A.D.2d at 1083. To defeat the defendant's summary judgment motion, the plaintiff presented water quality reports commissioned by the defendant *before the sale* that indicated poor water quality and affidavits from neighbors who observed the defendant obtaining drinking water from other sources because of unspecified problems with the well. *Id.* at 1084. There is no similar evidence here. At best, Lockhart has cited evidence of negligence by Bennett or Defendants in failing to recognize the potential for lead-based paint on the Property. But this does not rise to the level of fraud.

**b. Age of the House**

Lockhart also argues that Defendants' misrepresentation was more expansive than the statement alleged in the complaint, asserting that "[t]he listing also included that the home was built in 2004, a representation that the Defendants and Ms. Bennett were aware was not true." (Dkt. 59-27 at 18). Lockhart's fraud theory based on the age of the house is unreasonable as a matter of law.

Whether a plaintiff's reliance on a misstatement is reasonable depends on "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). Because the "reasonable-reliance element . . . involve[s] many factors to 'consider[] and balance[],' no single one of which is 'dispositive[,]" it is "often a question of fact for the jury rather than a question of law for the court." *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011) (quoting *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)). That said, "numerous appellate courts in New York have upheld summary judgment on the issue of reasonable reliance. . . ." *Fierro v. Gallucci*, No. 06-CV-5189 JFB WDW, 2010 WL 1223122, at *15 (E.D.N.Y. Mar. 24, 2010) (citing cases), *aff'd*, 423 F. App'x 17 (2d Cir. 2011); *see also Schulhof v. Jacobs*, 157 A.D.3d 647, 648 (1st Dep't 2018) ("The issue of reasonable reliance can be resolved on a summary judgment motion.").

"Only '[w]hen matters are held to be peculiarly within defendant's knowledge[] [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no

independent means of ascertaining the truth.'" *Crigger*, 443 F.3d at 234 (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980), *abrogated on other grounds by Peltz v. SHB Commodities*, 115 F.3d 1082, 1090 (2d Cir. 1997)). To that end, "[a] party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence." *Axos Bank v. Michael Gangi Plumbing & Heating Contractors, Inc.*, 247 A.D.3d 696, 698 (2d Dep't 2026) (quoting *Goldberg v. KOSL Bldg. Grp., LLC*, 236 A.D.3d 995, 997 (2d Dep't 2025)).

To the extent Lockhart argues that Defendants' misrepresentation was stating in the property listing that the house was built in 2004, any reliance on that statement was unreasonable. That is because the same property listing also stated: "THE ORIGINAL HOUSE WAS BUILT IN 1827, MOVED TO ITS CURRENT LOCATION IN 2004[.]" (Dkt. 51-6 at 2). Indeed, Lockhart confirms in his affidavit that before he purchased the Property, he "underst[ood] that . . . the 'original house was built in 1827,' [and that] it . . . had been 'completely renovated to today's standards & amenities.'" (Dkt. 59 at ¶ 4). Lockhart also testified that he was aware of the "backstory of the home" before he purchased it and that he "knew [Held] was a restoration architect, [who] had gutted the home first and cut it and moved the structure to its new location and set it on top of a new foundation and put in all the amenities: [n]ew wiring, new heating systems, new moldings, anything of that nature, to make it a 2004 build date." (Dkt. 52-23 at 72).

Based on Lockhart's own admissions, any reliance he placed on the "Year Built: 2004" notation in the listing, is defeated by his understanding that the original house was built in 1827 and later restored "to make it a 2004 build date." Furthermore, the PCD

Statement completed by Defendants states that the house is "193 years [old], renovated 2004." (Dkt. 51-7 at 2). Although the copy of the PCD Statement submitted by Defendants is not signed by Lockhart, he testified at his deposition that he received the PCD Statement before purchasing the Property and acknowledged that he read that the house was 193 years old. (Dkt. 52-23 at 121-23). He also acknowledged that he received the PCD Statement in the contract to buy the Property. (Dkt. 51-10 at 4).

"Moreover, when the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it." *Glob. Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 100 (1st Dep't 2006). A defendant "cannot reasonably rely on such representations without making additional inquiry to determine their accuracy." *Id.* The discrepancy between the "Year Built: 2004" notation and the statement that the house was "original[ly] built in 1827" should have prompted Lockhart to inquire further if the house's build date was an important issue to him. *See Banque Franco-Hellenique de Com. Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 26 (2d Cir. 1997) ("While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused."). Instead, the record indicates that Lockhart only asked his own real estate agent during the final walkthrough whether the house contained lead paint. (Dkt. 59 at ¶ 10). Lockhart, his real estate agent, and his attorney never inquired with Bennett or Defendants about the age of the house or whether Defendants were aware of lead-based paint before closing on the Property.

As Defendants point out, Lockhart was not an unsophisticated buyer. He previously purchased two residential properties and had interests in real estate investment properties,

including a rental property he owned in Rochester, New York. (Dkt. 52-23 at 38-39). Lockhart testified he took an "inner city landlord" course that "included subject matter about lead and the necessity to disclose with a form the potential [presence of lead], even to renters." (*Id.* at 60). Lockhart was also represented in the transaction by a real estate agent and attorney. (*See* Dkt. 51at ¶ 81; Dkt. 59-26 at ¶ 81; Dkt. 52-23 at 187-88).

In opposition, Lockhart simply reiterates his own understanding that if the house was indicated as built in 2004, then he believed he did not "need[] to worry about lead paint." (Dkt. 59-27 at 20). Based on the circumstances of this case, that reliance was unreasonable and Lockhart has failed to raise a triable issue of fact to the contrary. Defendants are therefore entitled to summary judgment on the fraud claim.

**2. Unjust Enrichment**

Defendants are also entitled to summary judgment on Lockhart's unjust enrichment claim. "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005). An unjust enrichment claim under New York law requires "the plaintiff to establish: '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). Unjust enrichment is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). Defendants argue that Lockhart's unjust

enrichment claim is barred by the existence of a valid and enforceable contract between the parties. (Dkt. 57 at 28-29; *see* Dkt. 51-10). The Court agrees.

"[A] quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (citation modified) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987)). "The notion of unjust enrichment applies where there is no contract between the parties[.]" *Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 212 (2d Cir. 2000). "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Beth Israel Med. Ctr.*, 448 F.3d at 587 (quoting *Clark–Fitzpatrick, Inc.*, 70 N.Y.2d at 389). "If at summary judgment the court concludes that the contract at issue is 'valid and enforceable,' then 'defendants are entitled to summary judgment on the unjust enrichment claim.'" *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 594 (S.D.N.Y. 2018) (quoting *Blum v. Spaha Cap. Mgmt., LLC*, 44 F. Supp. 3d 482, 496 (S.D.N.Y. 2014)).

Lockhart concedes his unjust enrichment claim is based on the agreement to purchase the Property. (Dkt. 59-27 at 28 ("Defendants were enriched at the Plaintiff's expense when the Plaintiff paid the Defendants $793,000 for the property at issue.")). Yet he argues the unjust enrichment claim may proceed despite the contract's existence because the contract was induced by fraud and is "silent as to the date on which the Property was

built, the type of renovations made, and the standards that those renovations were alleged to be compliant with, which are the subject matter of [the] unjust enrichment claim." (*Id.* at 27). But for the reasons explained above, the Court concludes that the contract was not induced by fraud, and no reasonable jury could find otherwise. The contract is therefore valid and enforceable, and Lockhart does not make any additional arguments to the contrary.

The Court also concludes that the contract covered the subject matter at issue in Lockhart's unjust enrichment claim. Lockhart's claim is based on representations made in the Multiple Listing Service and the contract expressly disclaims representations made in that listing. At the top of the first page, the contract states, "Buyer acknowledges that information contained in the Multiple Listing Service is not guaranteed and should be independently verified before signing this Contract." (Dkt. 51-10 at 2). Lockhart chose not to independently verify the information in the listing despite this warning. The contract was also not subject to any contingencies, and the Property was sold "as is." (*Id.* at 3-4). Lockhart cannot now seek damages on a quasi-contract claim based on alleged representations made during the sale of the Property when there is a contract between the parties and no dispute the parties performed pursuant to that agreement. *See Goldman*, 5 N.Y.3d at 572 ("Here, . . . there was no unjust enrichment because the matter is controlled by contract."); *see also Amiri v. Gurusamy*, 162 N.Y.S.3d 644, 650 (N.Y. Albany Co. Ct. 2021) ("Moreover, where, as here, there exists a binding sales contract which specifically provides that the property is sold 'as is' there can be no recovery in quasi-contract. . . ."). To the extent Lockhart argues that he never "accepted the contract" (Dkt. 59-27 at 24), this

theory is directly refuted by the fact that he paid the agreed-to price, the deed was filed at the local county clerk's office, and Lockhart acknowledges he owns the Property. Because an enforceable contract governs the subject matter of Lockhart's unjust enrichment claim, Defendants are entitled to summary judgment on that claim.[7]

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 50) is granted and Plaintiff's claims are dismissed. The Clerk of Court is directed to enter judgment in favor of Defendants and to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 24, 2026
Rochester, New York

[7] As the Court grants summary judgment for Defendants on all claims, it need not address Defendants' arguments as to waiver and punitive damages.